**SKAPIK LAW GROUP**
Mark J. Skapik (SBN 164957)
    Email: mskapik@skapiklaw.com
Geralyn L. Skapik (SBN 145055)
    Email: gskapik@skapiklaw.com
Blair J. Berkley (SBN 222293)
    Email: bberkley@skapiklaw.com
5861 Pine Avenue, Suite A-1
Chino Hills, California 91709
Telephone:   (909) 398-4404
Facsimile:   (909) 398-1883

**SOUTHERN CALIFORNIA LAWYERS GROUP, P.C.**
Eric C. Morris (SBN 243425)
    Email: emorris@lawsclg.com
5861 Pine Avenue, Suite A-1
Chino Hills, California 91709
Telephone: (909) 466-4400
Facsimile: (909) 839-5004

Attorneys for Plaintiffs
MATTHEW RAMSEY and
SCOTT RAMSEY-FRENTSOS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW RAMSEY, an individual; SCOTT RAMSEY-FRENTSOS, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF ORANGE; ORANGE COUNTY SHERIFF'S DEPARTMENT; DEPUTIES 1 through 100, inclusive; SUPERVISORS 101 through 120, inclusive; and DOES 121 through 130, inclusive, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR:** <br><br> 1.  Civil rights (42 U.S.C. § 1983) <br> 2.  Civil rights (42 U.S.C. § 1983) <br> 3.  Civil rights (42 U.S.C. § 1983) <br> 4.  Loss of consortium <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs MATTHEW RAMSEY ("RAMSEY") and SCOTT RAMSEY-FRENTSOS ("FRENTSOS") allege as follows:

1. Plaintiff RAMSEY is, and at all times mentioned herein was, an individual residing in the City of Long Beach, County of Los Angeles, California.

2. Plaintiff FRENTSOS is, and at all times mentioned herein was, an individual residing in the City of Long Beach, County of Los Angeles, California.

3. Plaintiffs RAMSEY and FRENTSOS are a same-sex couple, and at all times mentioned herein, were married.

4. Defendant COUNTY OF ORANGE ("COUNTY") is a political subdivision of the State of California.

5. Defendant ORANGE COUNTY SHERIFF'S DEPARTMENT ("OCSD") is a COUNTY department. In administering the COUNTY jails, and in establishing and implementing policies and procedures for the safekeeping of inmates in the COUNTY jails, the OCSD acts for the COUNTY.

6. Defendant DEPUTIES 1 through 100, inclusive, were employees of the OCSD and worked as Deputies at the Men's Central Jail in Santa Ana on March 29, 2017, through April 13, 2017. The true names of DEPUTIES 1 through 100, inclusive, are unknown to Plaintiffs at this time. Therefore, Plaintiffs sue these Defendants by such fictitious names. When the true names and capacities of these Defendants are ascertained, Plaintiffs will amend this Complaint to allege their true names and capacities.

7. Defendant SUPERVISORS 101 through 120, inclusive, were employees of the OCSD and worked as supervisors at the Men's Central Jail in Santa Ana on March 29, 2017, through April 13, 2017. The true names of SUPERVISORS 101 through 120, inclusive, are unknown to Plaintiffs at this time. Therefore, Plaintiffs sue these Defendants by such fictitious names. When the true names and capacities of these Defendants are ascertained, Plaintiffs will amend this Complaint to allege their true names and capacities.

8.     The true names and capacities of Defendants DOE 121 through 130, inclusive, are unknown to Plaintiffs at this time.  Therefore, Plaintiffs sue these Defendants by such fictitious names.  When the true names and capacities of these Defendants are ascertained, Plaintiffs will amend this Complaint to allege their true names and capacities.

9.     Plaintiffs are informed and believe and thereon allege that at all times mentioned herein each of the Defendants DEPUTIES 1 through 100, SUPERVISORS 101 through 120, and DOES 121 through 130 was the employee of Defendant OCSD and in doing the things herein alleged, Defendants acted under color of state law and within the course and scope of their employment.  The conduct of each Defendant was authorized and ratified by Defendants COUNTY and OCSD.

## JURISDICTION

10.     This action arises under the Civil Rights Act of 1871, 42 U.S.C. section 1983, and the Eighth and Fourteenth Amendments to the Constitution of the United States.  This Court has jurisdiction of the federal claims under 28 U.S.C. sections 1331 and 1343(a).  This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. section 1367(a).

## VENUE

11.     Defendant County of Orange is a resident of Orange County and the claims alleged herein arose from events and/or omissions occurring in Orange County.  Therefore, venue lies in the Central District of California, Southern Division.  28 U.S.C. § 1391(b)(1) and (b)(2).

## GENERAL ALLEGATIONS

12.     RAMSEY drove while under the influence of Ambien, a sleeping pill, and was arrested for DUI.  His case was heard at the Superior Court of the State of California, County of Orange, West Justice Center, Westminster, California.  In a plea agreement, RAMSEY pled guilty and was sentenced to 80 hours of community service.

1  He completed 60 to 70 hours and was granted two extensions to complete the remaining
2  hours.

3       13.    On March 29, 2017, RAMSEY appeared at the West Justice Center for a
4  status conference. He requested a third extension. A new (female) judge denied the
5  request and ordered RAMSEY to be taken into custody. RAMSEY was transported to
6  the Men's Central Jail in Santa Ana.

7       14.    RAMSEY reported to Defendants DEPUTIES 1-100 and DOES 121-130
8  that he was homosexual, that he was married to a man, that he was taking medications
9  for hypertension, asthma, depression, and anxiety, and that he had a (previously) broken
10  hand. The medical staff put a new splint on the broken hand.

11       15.    RAMSEY is informed and believes and thereon alleges that, as a proximate
12  result of his medical conditions and medications, he was assigned to a cell in the
13  Sheltered Living unit that he shared with two other men. RAMSEY felt safe in the
14  Sheltered Living unit and had no incidents with the inmates.

15       16.    On March 30, RAMSEY reported chest pains and panic and was sent to see
16  nurse "Abby." Abby referred RAMSEY to social worker "Julie" for counseling.

17       17.    When his visit with "Julie" ended, RAMSEY was sent back (unescorted) to
18  Sheltered Living. RAMSEY, unfortunately, got lost. DEPUTY 1 stopped and
19  confronted RAMSEY in the hallway and threatened him.

20       18.    At Sheltered Living, DEPUTY 2 found RAMSEY, his medical problems,
21  and his calls for assistance to be very annoying. DEPUTY 2 taunted RAMSEY and
22  called him various profane names.

23       19.    On the morning of March 31, RAMSEY was taken to see a doctor for
24  treatment of his broken hand.

25       20.    Following the doctor's visit, RAMSEY was transferred to Module L where
26  he was placed with 18 to 20 general-population inmates (mostly gang members).

27
28

1       21.    RAMSEY is informed and believes and thereon alleges that DEPUTIES 1-

2   100 and DOES 121-130 caused RAMSEY to be transferred to Module L with the

3   intention of causing him harm.

4       22.    At Module L, Plaintiff immediately feared for his life and pled with

5   DEPUTIES 1-100 and DOES 121-130 to return him to Sheltered Living.  It appeared to

6   Plaintiff that everyone in Module L, including DEPUTIES 1-100, was against him.

7   DEPUTY 3 ignored RAMSEY's pleas and ordered RAMSEY to lie down.  DEPUTY 3

8   threw RAMSEY down on a mattress.

9       23.    Module L is a dormitory-like facility.  DEPUTIES 1-100 could observe

10   most of the activity in Module L through tinted glass windows.

11       24.    RAMSEY was immediately threatened by all the inmates.

12       25.    The inmates in Module L instructed RAMSEY not to go up to the windows

13   to solicit help from the DEPUTIES and threatened serious injuries if he tried to solicit

14   help.

15       26.    RAMSEY lined up (in Module L) two or three times on March 31 for

16   medication distribution ("med call").  Plaintiff received his hypertension medications

17   and took several breaths from an inhaler for his asthma.  At each med call, RAMSEY

18   told DEPUTIES 1-100 and DOES 121-130 that he feared for his life, he needed help, he

19   was in the wrong place, and he should be in Sheltered Living.

20       27.    On the morning of April 1, the inmates made remarks regarding

21   RAMSEY's purported body odor and encouraged him to take a shower.

22       28.    As soon as he got his hair wet in the shower, a Black Mexican inmate

23   struck RAMSEY (with his fist) in the back of his neck.  The blow was so hard that

24   RAMSEY felt his brain shake and bounce around.  RAMSEY saw stars but did not lose

25   consciousness.  Looking at the observation windows, RAMSEY saw that some of the

26   DEPUTIES 1-100 witnessed the assault.  No DEPUTIES, however, responded to assist

27   RAMSEY.

28

29.     At each med call on April 1, RAMSEY told DEPUTIES 1-100 and DOES 121-130 that he had been struck, he feared for his life, he needed help, he was in the wrong place, and he should be in Sheltered Living.  Defendants expressed a complete lack of concern.

30.     On the morning of April 2, RAMSEY took a shower.  When he put his head down, the same Black Mexican inmate struck RAMSEY (with his fist) in the back of his neck (again).  RAMSEY was rendered unconscious and fell to the floor.  Some of the DEPUTIES 1-100 witnessed the assault.  No one responded to the assault.

31.     When RAMSEY regained consciousness, he felt extreme confusion and lost his sense of time.

32.     At 11:00 a.m. on April 2, RAMSEY was taken to the visiting area to see his husband, Plaintiff FRENTSOS.  RAMSEY was unable to think or communicate coherently to FRENTSOS.

33.     After the visit, RAMSEY was escorted back to Module L.

34.     At each med call on April 2, RAMSEY received his hypertension medications and took several breaths from an inhaler for his asthma.  RAMSEY told DEPUTIES 1-100 and DOES 121-130 that he had been struck (for the second time), he feared for his life, he needed help, he was in the wrong place, and he should be in Sheltered Living.   Defendants expressed a complete lack of concern.

35.     During the early morning of April 3, RAMSEY was assaulted while in his bunk trying to sleep.  An inmate with a cast on one arm, and a long ponytail, struck RAMSEY in the mouth with his cast.

36.     RAMSEY attempted to get up and go to the window to solicit help.  He waived his arms to attract the attention of the DEPUTIES 1-100 and DOES 121-130.  The inmates ordered RAMSEY to get back in his bunk, and DEPUTIES 1-100 and DOES 121-130 in the window waived RAMSEY to go back to his bunk.

37.     On the afternoon of April 3, RAMSEY was slapped in the face and hit in the neck by an inmate (a Canadian, 20 or 21 years old) when he (in a confused state) asked to go to 7-Eleven.

38.     On April 4, a large inmate (approximately 400 pounds and an apparent gang member) advised RAMSEY to hurt himself to get into protective custody. The inmate also asked RAMSEY if he was an informant.

39.     Accordingly, at the next med call, RAMSEY told DEPUTIES 1-100 and DOES 121-130 that he wanted to kill himself.

40.     DEPUTIES 1-100 took RAMSEY's clothes and put him (naked) in a holding cell by himself. The holding cell had only a concrete bench and an inoperable toilet that was full of milk cartons and food.

41.     A nurse and some DEPUTIES performed a mental examination. RAMSEY remembers stating that he was married to Scott Ramsey-Frentsos and that Bill Clinton was the president. DEPUTIES 1-100 and DOES 121-130 left RAMSEY naked, in the holding cell, for approximately 24 hours.

42.     On or about April 5, Defendants transferred RAMSEY to the acute mental ward where he was placed in isolation without any clothes.

43.     RAMSEY remained in isolation, in the acute mental ward, until he was discharged on April 13. Although DOES 121-130 took the vital signs of some inmates in the acute mental ward, RAMSEY's vital signs were never taken. He suffered severe asthma, depression, anxiety, and panic.

44.     Following his discharge, RAMSEY's physicians diagnosed him as suffering from post-concussive syndrome, severe post-traumatic stress syndrome, panic disorder, depression, and loss of memory. His physicians placed him on short-term disability. Plaintiff has been unable to return to work.

## PRESENTATION OF WRITTEN CLAIM

45.     On June 21, 2017, in compliance with California *Government Code* section 905, RAMSEY presented to the COUNTY a written claim for damages suffered during

1     the period March 29, 2017, to April 13, 2017, and after.  On September 12, 2017, the

2     County rejected RAMSEY's claim.

3          46.      On August 1, 2017, in compliance with California *Government Code*

4     section 905, FRENTSOS presented to the COUNTY a written claim for damages

5     suffered on and after March 29, 2017.  In or about October 2017, the COUNTY rejected

6     FRENTSOS's claim.

7                                       **I.**

8                      **FIRST CAUSE OF ACTION**

9        **VIOLATION OF CIVIL RIGHTS [42 U.S.C. § 1983]**

10    (By Plaintiff RAMSEY Against Defendants DEPUTIES 1-100 and DOES 121-130)

11         47.      Plaintiff incorporates by reference the allegations contained in paragraphs 1

12    through 46 as though fully set forth herein.

13         48.      Upon arrival to the Men's Central Jail on March 29, 2017, RAMSEY told

14    Defendants DEPUTIES 1-100 and DOES 121-130 that he was homosexual and married

15    to a man, Plaintiff FRENTSOS.  RAMSEY told Defendants that he feared for his safety.

16         49.      While in Defendants' custody, RAMSEY had a constitutional right to be

17    safe and free from attacks by fellow inmates.

18         50.      DEPUTIES 1-100 and DOES 121-130 knew that there was a substantial

19    risk that RAMSEY would be attacked if placed in the general population at the Men's

20    Central Jail.

21         51.      On March 30, while RAMSEY was returning to Sheltered Living from a

22    visit with social worker "Julie," Defendant DEPUTY 1 stopped and confronted

23    RAMSEY and threatened him.

24         52.      At Sheltered living on March 30, DEPUTY 2 found RAMSEY, his medical

25    problems, and his calls for assistance to be very annoying.  DEPUTY 2 taunted

26    RAMSEY and called him various profane names.

27         53.      Plaintiff is informed and believes and thereon alleges that on March 31,

28    2017, with the intention of causing RAMSEY harm, or with actual knowledge of the

substantial risk that RAMSEY would be harmed, and under color of state law,
Defendants DEPUTIES 1-100 and DOES 121-130 caused RAMSEY to be transferred to
Module L, which held 18 to 20 violent general-population inmates (mostly gang
members).

54.    Defendants' transfer of RAMSEY to Module L and into the general inmate
population violated the Cruel and Unusual Punishments clause of the Eighth
Amendment and put RAMSEY at substantial risk of suffering serious harm.

55.    The Module L inmates immediately commenced to threaten RAMSEY and
put RAMSEY at substantial risk of suffering serious harm.

56.    RAMSEY lined up (in Module L) two or three times on March 31 for
medication distribution ("med call"). Plaintiff received his hypertension medications
and took several breaths from an inhaler for his asthma. At each med call, RAMSEY
told the Defendants DEPUTIES 1-100 and DOES 121-130 that he feared for his life, he
needed help, he was in the wrong place, and he should be in Sheltered Living.

57.    As Defendants expected, and as a direct and proximate result of
Defendants' intention to cause Plaintiff harm or deliberate indifference, RAMSEY was
attacked by Module L inmates on April 1, 2, and 3.

58.    At each med call on April 1 and 2, RAMSEY received his hypertension
medications and took several breaths from an inhaler for his asthma. RAMSEY told
Defendants DEPUTIES 1-100 and DOES 121-130 that he had been struck, he feared for
his life, he needed help, he was in the wrong place, and he should be in Sheltered
Living.

59.    DEPUTIES 1-100 and DOES 121-130 observed all four attacks but,
nevertheless, failed to isolate RAMSEY from the general inmate population.

60.    A reasonable corrections officer in the circumstances would have
appreciated the substantial risk that RAMSEY was subjected to in Module L and would
have returned him to Sheltered Living.

61.   RAMSEY was not isolated from the general-population inmates until April 4. RAMSEY received no treatment for his injuries.

62.   On or about April 5, and under color of state law, Defendants DEPUTIES 1-100 and DOES 121-130 transferred RAMSEY to the acute mental ward where he was placed in isolation without any clothes.

63.   Defendants knew that, in his physical condition and distressed mental state, it was substantially likely that RAMSEY would suffer severe emotional distress if placed in isolation.

64.   Defendants' isolation of RAMSEY in the acute mental ward violated the Cruel and Unusual Punishments clause of the Eighth Amendment and put RAMSEY at substantial risk of suffering serious harm.

65.   A reasonable corrections officer in the circumstances would have appreciated the substantial risk of psychological injury that RAMSEY was subjected to in an isolation unit in the acute mental ward and would have returned RAMSEY to the Sheltered Living unit.

66.   As a direct and proximate result of Defendants' actions and deliberate indifference, and his isolation in the acute mental ward, Plaintiff suffered severe panic attacks, emotional distress, and psychological injuries.

67.   As a proximate result of Defendants' actions and deliberate indifference, RAMSEY suffered the loss of his employment, earnings, other employment benefits, humiliation, embarrassment, and mental anguish.

68.   In violating RAMSEY's Eighth Amendment rights, Defendants' intended to subject RAMSEY to cruel and unjust hardship in conscious disregard of his rights. Defendants' conduct was malicious, oppressive and despicable and warrants the assessment of punitive damages.

///

///

## II.

## SECOND CAUSE OF ACTION

## <u>VIOLATION OF CIVIL RIGHTS [42 U.S.C. § 1983]</u>

(By Plaintiff RAMSEY Against Defendants SUPERVISORS 101 to 120)

69.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 68 as though fully set forth herein.

70.   On March 30, 2017, Plaintiff was incarcerated in the Sheltered Living unit at the Men's Central Jail.

71.   On March 30, 2017, RAMSEY had a confrontation with DEPUTY 1.

72.   In Sheltered Living, DEPUTY 2 found RAMSEY and his medical problems to be very annoying.  DEPUTY 2 taunted RAMSEY and called him various profane names.

73.   While in Defendants' custody, RAMSEY had a constitutional right to be safe and free from attacks by fellow inmates.

74.   RAMSEY is informed and believes and thereon alleges that DEPUTIES 1-100 and DOES 121-130, with the intention of causing RAMSEY harm, or with actual knowledge of the substantial risk that RAMSEY would be harmed, sought approval from Defendant SUPERVISORS 101-120 to transfer RAMSEY from Sheltered Living to the general population in Module L.

75.   SUPERVISORS 101-120 knew there was a substantial risk that RAMSEY would be harmed if placed in the general population.

76.   Nevertheless, on March 31, 2017, with the intention of causing RAMSEY harm, or with actual knowledge of the substantial risk that RAMSEY would be harmed, and under color of state law, SUPERVISORS 101-120 approved, acquiesced to, and directed the transfer of RAMSEY to Module L, which held 18 to 20 violent general-population inmates.

77.     A reasonable corrections supervisor in the circumstances would have appreciated the substantial risk that RAMSEY was subjected to in Module L and would have returned him to Sheltered Living.

78.     Defendants' transfer of RAMSEY to Module L and into the general inmate population violated the Cruel and Unusual Punishments clause of the Eighth Amendment and put RAMSEY at substantial risk of suffering serious harm.

79.     The Module L inmates immediately commenced to threaten RAMSEY and put RAMSEY at substantial risk of suffering serious harm.

80.     As Defendants expected, and as a direct and proximate result of Defendants' intention to cause RAMSEY harm or deliberate indifference, RAMSEY was attacked by Module L inmates on April 1, 2, and 3.

81.     Plaintiff is informed and believes and thereon alleges that on or about April 5, SUPERVISORS 101-120 approved, acquiesced to, and directed RAMSEY's transfer from Module L to the acute mental ward where he was placed (naked) in isolation. Defendants knew that, in his physical condition and distressed mental state, it was substantially likely that RAMSEY would suffer severe emotional distress if placed in isolation.

82.     Defendants' isolation of RAMSEY in the acute mental ward violated the Cruel and Unusual Punishments clause of the Eighth Amendment and put RAMSEY at substantial risk of suffering serious harm.

83.     A reasonable corrections supervisor in the circumstances would have appreciated the substantial risk of psychological injury if RAMSEY was subjected to isolation in the acute mental ward and would have returned RAMSEY to the Sheltered Living unit.

84.     As a direct and proximate result of Defendants' actions and deliberate indifference, and his isolation in the acute mental ward, RAMSEY suffered severe panic attacks, emotional distress, and psychological injuries.

85.    In violating RAMSEY's Eighth Amendment rights, Defendants intended to subject RAMSEY to cruel and unjust hardship in conscious disregard of RAMSEY's rights. Defendants' conduct was malicious, oppressive, and despicable and warrants the assessment of punitive damages.

## III.

## THIRD CAUSE OF ACTION

## <u>VIOLATION OF CIVIL RIGHTS [42 U.S.C. § 1983]</u>

(By Plaintiff RAMSEY Against Defendants COUNTY and OCSD)

86.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 46 as though fully set forth herein.

87.    While in Defendants' custody, RAMSEY had an Eighth Amendment right to be safe and free from attacks and beatings by fellow inmates.

88.    Plaintiff is informed and believes and thereon alleges that, at the Men's Central Jail in Santa Ana, Defendants have policies, long-standing practices, or customs of mixing homosexual men with the general inmate population and treating homosexual men as fodder for the entertainment, assaults, and abuse of the DEPUTIES and the general inmate population.

89.    While some California counties have policies of segregating homosexuals from general inmate populations, Defendants in the present case have decided to mix homosexuals with the general inmate population. Defendants adopted their policies and practices with the knowledge that assaults and abuse of homosexual inmates will be the inevitable result.

90.    Defendants' policies, practices, and customs of mixing homosexuals with the general inmate population evidences a deliberate indifference to RAMSEY's Eighth Amendment right to be safe and free from attacks and beatings by fellow inmates.

91.    On March 31, 2017, and pursuant to Defendants' policies, practices, and customs of mixing homosexual inmates with general population inmates, Defendants DEPUTIES 1-100, SUPERVISORS 101-120, and DOES 121-130 transferred RAMSEY

1   from Sheltered Living to Module L where RAMSEY was placed with 18-20 general
2   inmate population members (mostly gang members).

3       92.    Defendants' transfer of RAMSEY to Module L and into the general inmate
4   population violated the Cruel and Unusual Punishments clause of the Eighth
5   Amendment and put RAMSEY at substantial risk of suffering serious harm.

6       93.    The Module L inmates threatened RAMSEY immediately upon his arrival.
7   RAMSEY feared for his life and pled with DEPUTIES 1-100 and DOES 121-130 to
8   return him to Sheltered Living.

9       94.    As a direct and proximate result of Defendants' policies, practices, or
10   customs, RAMSEY was attacked by Module L inmates on April 1, 2, and 3.

11       95.    The cruel and unusual punishment inflicted on RAMSEY, in violation of
12   the Eighth Amendment, was the direct and proximate result of the implementation of
13   Defendants' policies, practices, and customs of mixing homosexual men with the
14   general inmate population and treating homosexual men as fodder for the entertainment,
15   assaults, and abuse of the DEPUTIES and general inmate population.

16       96.    As a direct and proximate result of Defendants' policies, practices, and
17   customs, RAMSEY suffered severe emotional distress and physical, mental, and
18   psychological injuries.

19       97.    At each med call on April 2 and 3, RAMSEY received his hypertension
20   medications and took several breaths from an inhaler for his asthma.  RAMSEY told the
21   DEPUTIES 1-100 and DOES 121-130 that he had been struck, he feared for his life, he
22   needed help, he was in the wrong place, and he should be in Sheltered Living.
23   Defendants expressed a complete lack of concern.

24       98.    On April 4, a large inmate in Module L advised RAMSEY to hurt himself
25   to get into protective custody.

26       99.    Accordingly, RAMSEY told DEPUTIES 1-100 and DOES 121-130 at the
27   next med call that he wanted to kill himself.

28

100.   RAMSEY is informed and believes and thereon alleges that, at the Men's Central Jail, Defendants have policies, practices, or customs of punishing high-maintenance inmates who request special attention and special services.

101.   Defendants have adopted these policies, practices, and customs with knowledge that violations of inmates' Eighth Amendment rights will be the inevitable result.

102.   Defendants' policies, practices, and customs of punishing high-maintenance inmates who request special attention and special services evidences a deliberate indifference to RAMSEY's Eighth Amendment right to be free from cruel and unusual punishment.

103.   On April 5, and pursuant to Defendants' policies, practices, and customs of punishing high-maintenance inmates, Defendants transferred RAMSEY to the acute mental ward where he was placed (naked) in isolation.

104.   Defendants knew that RAMSEY suffered no mental problems and that he simply feared for his life.

105.   Defendants' isolation of RAMSEY in the acute mental ward violated the Cruel and Unusual Punishments clause of the Eighth Amendment and put RAMSEY at substantial risk of suffering serious harm.

106.   RAMSEY remained in isolation, in the acute mental ward, until he was discharged on April 13.

107.   Defendants' isolation of RAMSEY in the acute mental ward constituted a violation of the Cruel and Unusual Punishments clause of the Eighth Amendment.

108.   As a direct and proximate result of Defendants' policies, practices, and customs, RAMSEY suffered severe panic attacks, emotional distress, and psychological injuries.

///

///

# IV.

## FOURTH CAUSE OF ACTION

## <u>LOSS OF CONSORTIUM</u>

(By Plaintiff Frentsos Against All Defendants)

109.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 108 as though fully set forth herein.

110.   At all times relevant, Plaintiffs RAMSEY and FRENTSOS were legally married.

111.   As a proximate result of Defendants' unlawful actions in violation of the Eighth Amendment, RAMSEY suffered severe emotional distress and physical, mental, and psychological injuries.

112.   Prior to the emotional distress and physical, mental, and psychological injuries RAMSEY suffered at the Men's Central Jail, he was able to and did perform his duties as spouse.

113.   As a proximate result of Defendants' unlawful actions in violation of the Eighth Amendment, RAMSEY is no longer able to perform the work and services usually performed by him in the care, maintenance, and management of the family home.  RAMSEY will be unable to perform such work, services, and duties in the future.  FRENTSOS, therefore, has been deprived, and will be deprived, of the consortium of his spouse, including the performance of his spouse's necessary duties.

THEREFORE, Plaintiffs pray for judgment against Defendants as follows:

## <u>ON THE FIRST CAUSE OF ACTION (CIVIL RIGHTS)</u>

1.   For general and special damages according to proof;

2.   For compensatory damages according to proof, including past and future lost earnings and other benefits;

3.   For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

4.   For reasonable attorney fees pursuant to 42 U.S.C. § 1988(b);

5.      For reasonable expert-witness fees pursuant to 42 U.S.C. § 1988(c);

6.      For costs of suit; and

7.      For such other and further relief as the court may deem proper.

**ON THE SECOND CAUSE OF ACTION (CIVIL RIGHTS)**

8.      For general and special damages according to proof;

9.      For compensatory damages according to proof, including past and future lost earnings and other benefits;

10.     For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

11.     For reasonable attorney fees pursuant to 42 U.S.C. § 1988(b);

12.     For reasonable expert-witness fees pursuant to 42 U.S.C. § 1988(c);

13.     For costs of suit; and

14.     For such other and further relief as the court may deem proper.

**ON THE THIRD CAUSE OF ACTION (CIVIL RIGHTS)**

15.     For general and special damages according to proof;

16.     For compensatory damages according to proof, including past and future lost earnings and other benefits;

17.     For reasonable attorney fees pursuant to 42 U.S.C. § 1988(b);

18.     For reasonable expert-witness fees pursuant to 42 U.S.C. § 1988(c);

19.     For costs of suit; and

20.     For such other and further relief as the court may deem proper.

**ON THE FOURTH CAUSE OF ACTION (LOSS OF CONSORTIUM)**

21.     For general and special damages according to proof;

22.     For costs of suit; and

23.     For such other and further relief as the court may deem proper.

///

///

1

2

3

4    Dated: April 23, 2018

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SKAPIK LAW GROUP

By:                        
Mark J. Skapik
Geralyn L. Skapik
Blair J. Berkley
Attorneys for Plaintiffs
MATTHEW RAMSEY and
SCOTT RAMSEY-FRENTSOS

1

## **DEMAND FOR JURY TRIAL**

2    Plaintiffs hereby demand trial by jury.

3

4                                                   SKAPIK LAW GROUP

5

6

7    Dated: April 23, 2018                    By:   _Gualyn Y Skapik_
                                                    Mark J. Skapik
8                                                   Geralyn L. Skapik
                                                    Blair J. Berkley
9                                                   Attorneys for Plaintiffs
                                                    MATTHEW RAMSEY and
10                                                  SCOTT RAMSEY-FRENTSOS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT